```
 1              IN THE UNITED STATES DISTRICT COURT

 2              FOR THE WESTERN DISTRICT OF TEXAS

 3                        WACO DIVISION

 4

 5  DAEDALUS BLUE, LLC,          )(

 6       PLAINTIFF,              )(    CIVIL ACTION NO.

 7                               )(    6:20-CV-1152-ADA

 8  VS.                          )(    WACO, TEXAS

 9                               )(

10  MICROSOFT CORPORATION,       )(    OCTOBER 18, 2021

11       DEFENDANT.              )(    2:32 P.M.

12                  CLAIM CONSTRUCTION HEARING

13         BEFORE THE HONORABLE JUDGE ALAN D ALBRIGHT

14                UNITED STATES DISTRICT JUDGE

15

16  FOR THE PLAINTIFF: Ms. Denise M. De Mory
                       Mr. Michael Flynn-O'Brien
17                     Ms. Robin Curtis
                       Ms. Brenda Entzminger
18                     Ms. Jennifer L. Gilbert
                       Mr. Nicholas Mancuso
19                     Bunsow De Mory, LLP
                       701 El Camino Real
20                     Redwood City, CA 94063

21
    COURT REPORTER:    Ms. Shelly Holmes, CSR, TCRR
22                     Certified Shorthand Reporter
                       2593 Myrtle Road
23                     Diana, TX 75640
                       (903) 720-6009
24                     shellyholmes@hotmail.com

25  (Proceedings recorded by mechanical stenography, transcript
    produced on a CAT system.)
```

```
 1   FOR THE DEFENDANT: Mr. Donald E. Daybell
                        Orrick, Herrington & Sutcliffe, LLP
 2                      2050 Main Street
                        Suite 1100
 3                      Irvine, CA 92614-8255

 4                      Mr. Jacob M. Heath
                        Mr. Jared Bobrow
 5                      Orrick, Herrington & Sutcliffe, LLP
                        1000 Marsh Road
 6                      Menlo Park, CA 94025

 7                      Mr. Barry K. Shelton
                        Shelton Coburn, LLP
 8                      311 RR 620 S
                        Suite 205
 9                      Austin, TX 78734-4775

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1              THE COURT:  Good afternoon, everyone.

 2              Thank you very much for accommodating me and

 3   moving this hearing up.  I appreciate it.

 4              Katherine, if you'd call the case, please.

 5              COURTROOM DEPUTY:  Certainly.  The Court calls

 6   Waco 6:20-CV-1152, Daedalus Blue, LLC, vs. Microsoft

 7   Corporation for a Markman hearing.

 8              THE COURT:  If I could have announcements from

 9   counsel, please.

10              MS. DE MORY:  Sure.  Good afternoon, Your Honor.

11   This is Denise De Mory from Bunsow De Mory.  With me in the

12   room is Michael Flynn-O'Brien, who will be doing the

13   primary argument this afternoon.  On the phone should be

14   Mr. Horton, our local counsel, and our client, principal of

15   Daedalus Blue, Ed Gomez.

16              THE COURT:  Mr. Horton is going to be doing some

17   arguing today?

18              MS. DE MORY:  He will not.  He's just -- I was

19   just introducing him.

20              THE COURT:  Okay.  I was -- this was going to be a

21   first.  I was looking forward to it.

22              Anyone else for Plaintiff?

23              MS. DE MORY:  Other team members are -- are on the

24   line, Robin Curtis, Brenda Entzminger, Jen Gilbert, and

25   Nick Mancuso.
```

1          THE COURT:  Okay.  And for Defendant, Microsoft?

2          MR. SHELTON:  Good afternoon, Your Honor.  We have

3    a client representative, Mark Taylor, in-house counsel for

4    Microsoft Corporation.  And I am Barry Shelton, not your --

5    not my first time here, from Shelton Coburn, LLP.  And for

6    the Orrick law firm, we have Don Daybell, Jacob Heath, and

7    Jared Bobrow.

8          Mr. Bobrow will take the first term, and

9    Mr. Daybell will take the other three terms.

10         Thank you, Your Honor.

11         THE COURT:  Very good.  Give me one second to get

12   organized and to get the claim constructions up.

13         Okay.  As I understand it, what we're primarily

14   going to be discussing today are means-plus-function

15   claims.

16         At this point, I probably know enough about

17   means-plus-function claims I don't need a tutorial on it.

18         And so the first claim term, as I understand it,

19   is "service class rule."

20         And I'll hear from the Defendant on that to start

21   with.

22         MR. BOBROW:  Very good, Your Honor.  This is Jared

23   Bobrow.  Thank you.  So --

24         THE COURT:  Mr. Bobrow, welcome back to my court.

25   It's always a pleasure.

1          MR. BOBROW:  It's a pleasure to be here, Your

2   Honor.  Thank you.

3          So why don't we just jump right in and go to Slide

4   5?

5          And unlike the balance of the terms, Your Honor,

6   the "service class rule" term is not a means-plus-function

7   term, just a three-word phrase.  And the Court having

8   reviewed the record at all, its preliminary construction is

9   that a service class rule is a rule which uses file

10  attributes to determine a service class for a file.

11         And what we propose, Your Honor, is a fine-tuning

12  of this or just a modest adjustment of this.

13         Why don't we go to Slide 7, and we can show you

14  what we propose.

15         What we propose to do is to take that phrase just

16  as it was in the preliminary construction but simply insert

17  the word "automatically" before the word "determine."  So

18  the construction would be a rule which uses file attributes

19  to automatically determine a service class for a file.

20         Now, this modification or adjustment to the

21  Court's preliminary construction simply stems from what the

22  patent applicants said during prosecution of the patent in

23  order to get their patent issued, in order to get their

24  claims allowed.

25         Why don't we go to Slide 9, please, Mr. Daybell?

1          And in the file history, you might recall, Your

2    Honor, that during the prosecution of this patent, all of

3    the claims of this patent stood rejected based upon an

4    obviousness combination that the examiner had put forth,

5    and all of the claims were rejected.

6          In response to that, the applicants submitted a

7    response to that, and they tried to overcome the

8    obviousness rejection.  And in doing so, they distinguished

9    the prior art that the examiner had found on the grounds

10   that the rules, as they called them, there of -- in all of

11   the claims, Claims 1 through 27, they said that those are

12   used for automatically associating policy rules with files.

13          So the discussion of the prior art spans over two

14   pages of the file history.  And you can see that in

15   connection with distinguishing the prior art, the applicant

16   said that in contrast to that art, the present invention is

17   dealing with automatically associating a certain policy

18   with a file management of the file in the storage system.

19          And they went on to say that those policies that

20   are automatically associated include rules which use file

21   attributes to determine the service class for the file.

22          So the idea and the -- the ground on which the art

23   was distinguished was to say this patent is about service

24   class rules, and those service class rules are

25   automatically assigned in this context.  This isn't a

1   manual process.  You don't have somebody punching in keys

2   at a system administration console or something.  This is

3   an automated process, and that's what the patent applicants

4   told the examiner.

5         And following this, of course, the -- the claims

6   did, in fact, issue.

7         So the -- currently, the Court's preliminary

8   construction tracks very closely to the second highlighted

9   phrase here, the one that says the policies include rules

10  which use file attributes to determine a service class for

11  the file.  That's almost exactly the same words that are

12  currently in the Court's preliminary construction.

13        We're simply asking that the Court's construction

14  also account for the language in the preceding paragraph on

15  Page -- on Page 4 of the file history that says that this

16  is an automatic process, and all of this is done

17  automatically.

18        Just to -- to finish it out, Your Honor, I'd

19  note --

20        If we can turn to Slide 10, please, Mr. Daybell.

21        -- that the idea that this is all done

22  automatically is fully consistent with the patent

23  specification.

24        In the -- in the summary of the invention, the

25  patent says multiple times that this is an automatic

1   process, that these service class rules, you apply them,

2   and the service classes are automatically selected.  This

3   is all done by -- you know, by the system essentially

4   looking at the file attributes and making a determination.

5         So what was said in the file history to

6   distinguish the prior art and get the patents allowed is

7   fully consistent with the specification.

8         Thank you, Your Honor.

9         THE COURT:  And thank you.

10        A response?

11        MR. FLYNN-O'BRIEN:  Yes, Your Honor.  This is

12   Michael Flynn-O'Brien for the Plaintiff, Daedalus Blue.

13        Mr. Bobrow, if you could turn off screen sharing

14   so I could -- thank you very much.

15        MR. BOBROW:  I was just trying to find the button.

16        MR. FLYNN-O'BRIEN:  Your Honor, thank you.

17        As a preliminary matter, Daedalus stands on its

18   papers with respect to its proposed construction of service

19   class rule.

20        As set forth therein, you know, we contend that

21   Microsoft has not justified departing from the plain

22   meaning of service class rule and hasn't identified any

23   ambiguity in the term, and there's no dispute as to what a

24   service class is or what a rule is.

25        Indeed, both Microsoft's construction and the

1    Court's construction use the term "service class" and

2    "rule" without any further clarification being required.

3         Nor, contrary to Mr. Bobrow's presentation a few

4    minutes ago, has Microsoft identified an express definition

5    in the specification for service class rule that includes,

6    for example, "automatically," or a clear unambiguous

7    disavowal of claim scope during prosecution.  And I'll

8    return to that in a second.

9         I mean, to be frank, we don't quite understand

10   where the dispute lies on this term.  As shown in the

11   parties' respective papers, both parties seem to agree that

12   the plain and ordinary meaning of service class rule was a

13   rule applied or used to assign a service class to a file,

14   full stop.  So there doesn't seem to be a basis to rewrite

15   the claim, certainly not as extensively as -- as Microsoft

16   has originally proposed or as it proposed going further

17   today.

18        You know, we recognize that the Court in its

19   preliminary constructions has construed the term "service

20   class" to include a limitation from dependent claims.

21   While we disagree, there was or is --

22        THE COURT:  Counsel, I'm -- counsel, I'm having a

23   little bit of a hard time hearing you.  I'm not sure how to

24   fix that for you, but if you could either talk louder or

25   get closer or something.  I'm -- I can -- I can hear you

1  but not well, and when we're talking about stuff that's

2  semi-technical or complicated, it's better if I can -- if I

3  can hear you, so...

4          MR. FLYNN-O'BRIEN:  Sure.  Your Honor, is this

5  better?

6          THE COURT:  Sorry, not a lot.

7          MR. FLYNN-O'BRIEN:  Well, I'm going to move the

8  microphone to right -- right below my chin.  See if

9  that's --

10          THE COURT:  That -- that's better for me.  Thank

11  you.

12          MR. FLYNN-O'BRIEN:  Okay.  Thank you, Your Honor.

13  And I apologize for that.

14          THE COURT:  No, no, or -- or can you push it back,

15  and I just won't be able to hear you.

16          MR. FLYNN-O'BRIEN:  I prefer that -- to sit with

17  the microphone right underneath.

18          THE COURT:  Okay.

19          MR. FLYNN-O'BRIEN:  All right.  We recognize that

20  the Court has in its preliminary constructions construed

21  the term "service class rule" to include a limitation for

22  the dependent claims.

23          While we disagree there was or is a need to do so,

24  we will not advance that argument any further here, except

25  to point out that the claims already describe and explain

1    how the service class rule is applied, what applies it.

2            For example, here we have Claim 1, which recites a

3    file evaluation module configured to apply the service

4    class rule to assign a service class to a file.

5            In this case, what we have -- service class rule

6    is clearly a structural limitation, right?  You have one

7    structure of the file evaluation module configured to apply

8    another structure, the service class rule, to end up with a

9    result, another structure, a service class being assigned

10   to a file.

11           What both the Court's preliminary construction and

12   Microsoft seeks to extend here is effectively to convert

13   this pure structural limitation into a functional one,

14   which is a little ironic, given Microsoft's -- its

15   inclination to like any functional claiming whatsoever in

16   the rest of the claims of the patents at issue here.

17           We -- with respect to automatically, it's our

18   position that there is no need to kind of take this any

19   further than the Court has already done.  There is no need

20   to take this structural claim limitation and further extend

21   it into a purely functional limitation.

22           With respect to the prosecution history, its claim

23   or argument that Microsoft proposes, I think they're --

24   you're only being presented with part of the story.  In the

25   portion of the spec, not shown here but as shown in

1   Microsoft's slides, besides Paragraph 9, the word

2   "automatically" is used with respect to policies, not the

3   service class rule.

4          The prosecution history does not say that the

5   service class rule automatically applies the attributes

6   or -- and indeed, the prosecution -- there certainly is no

7   unambiguous disclaimer in the prosecution history.

8          Here, Paragraph 10 is the portion relied upon in

9   Microsoft's briefing, which refers to, of course, the file

10  attributes the Court has added to its preliminary

11  construction.  There is no, in Paragraph 10, reference to

12  automatically.

13         Similarly, in Paragraph 11, when the applicant

14  continues to summarize and distinguish the prior art, it

15  doesn't use either automatically or for that matter file

16  attributes when describing what a service class rule is.

17  This is in Paragraph 11.

18         Finally, and I would just point out that in

19  Paragraph 13, when the applicant is summarizing the various

20  manner in which it gets over the prior art, the prior art

21  at issue here was condo, it's not limited to a service

22  class rule and certainly not limited to automatically

23  applying such a service class rule, or having a service

24  class rule automatically apply to file attributes.

25         It describes a number of other reasons, different

1   reasons why condo, that prior art, failed to teach or

2   describe the claimed invention, including that there wasn't

3   a data management system described therein, and there

4   wasn't some of these other claim limitations, including a

5   file evaluation configured to apply the service class rule

6   to assign a service class to a file.

7         So in conclusion, we don't propose changing the

8   Court's construction, but we don't think it's necessary to

9   add automatically.

10         Thank you.

11         THE COURT:  Very good.  A response?

12         And by the way, let me just note on Slide 4, the

13   little "where's the beef" picture is -- whoever threw that

14   in, that was -- I haven't had that happen before on these

15   slides.  So I thought that was kind of cute.

16         A response?

17         MR. BOBROW:  Yes.  Thank you, Your Honor.

18         First of all, on Slide 4, let me begin with that

19   because the suggestion seems to be made that the parties

20   have no disagreement here, and that's simply not the case,

21   as the Court can tell, not only from the arguments being

22   made, but what is on Slide 4 is a misstatement of our

23   position.

24         All we said in the brief that's being quoted here

25   is that the service class rule is used to assign a service

1  class to a file.  That wasn't an attempt to define the

2  term.  That's essentially saying what the service class

3  rule does, not what the service class rule is.

4       What the service class rule is we set forth in our

5  papers, and we think that with the modification that we've

6  proposed, that that is a suitable definition with the

7  modification that we proposed to the Court's construction.

8       Next, with respect to the argument being made that

9  the claims themselves say what is doing or not doing the

10  applying of the service class rules, that is the very

11  nature, Your Honor, of a disclaimer, as the Court well

12  knows.

13       There are times when a patent applicant doesn't

14  put a matter into the claims themselves but states through

15  definitional language, states through representations,

16  disclaimers, or disavowals that, indeed, the claims are to

17  be narrowed or to be construed in a particular way.

18       That's precisely what we have here.  We have the

19  patent applicant saying that what their invention is, is

20  automatically applying these rules in a particular way, and

21  hence, whether it's in the claim or not, the claims need to

22  be construed in that fashion.

23       Next, with respect to the argument about

24  automatically and how the file history talks about the

25  policies being applied automatically and not the rules, as

1  noted in the file history, the file history says that --

2  and this is at Page 5 of the file history, Paragraph 10 --

3  that, quote, the policies include rules which use file

4  attributes to determine a service class for the file.

5       These rules are the service class rules recited in

6  Claim 1.  That's what the patent applicant said.  The point

7  being that policies are nothing more here than a collection

8  of rules.  And when you automatically apply the policies,

9  you are necessarily automatically applying the rules.  They

10 go hand-in-glove.

11      So the -- the idea that because it talks about the

12 automatic application of policies that somehow that doesn't

13 apply to rules is simply mistaken.

14      And, finally, Your Honor, if I heard it correctly,

15 the argument seemed to be that there were some other bases

16 for distinguishing the condo prior art reference or perhaps

17 there were -- the applicant didn't need to distinguish

18 condo on the grounds that it's automatic because there were

19 other issues going on.

20      But as Your Honor knows, that's beside the point

21 when it comes to disclaimer, because under clear Federal

22 Circuit precedent, what you look at is what the applicant

23 said, not what was needed to distinguish the art but what

24 the applicant said to distinguish the art.

25      I would cite to the Court the Technology

1   Properties Limited case, 849 F.3d 1349, which is a Federal

2   Circuit case from 2017 that -- that is precisely in support

3   of that proposition.

4        So, Your Honor, we -- we do think with this minor

5   adjustment that reflects what's in the file history, that

6   reflects what's in the specification, we think that with

7   that fine-tuning, that the Court's preliminary construction

8   stands well.

9        Thank you.

10       THE COURT:  Any response from Plaintiff?

11       MR. FLYNN-O'BRIEN:  Briefly, Your Honor.

12       Only to point out that as even Mr. Bobrow admits,

13   when the -- the applicant is speaking about service of

14   automatically associating in the prosecution history, it's

15   talking about policies.  Those policies make up the rules

16   that is different than what Microsoft is proposing in its

17   modest modification of the construction.  It's talking

18   about where the rule which uses file attributes to

19   automatically determine a service class for a file.

20       That is not in the prosecution history.  So we

21   would submit that there is no clear and unambiguous

22   disclaimer that justifies Microsoft's amendment to the

23   Court's preliminary construction here.

24       Thank you.

25       THE COURT:  Anything else from counsel for

 1   Defendant?

 2          MR. BOBROW:  Nothing, Your Honor.  Thank you.

 3          THE COURT:  Okay.  I'll be back in a few seconds.

 4          (Pause in proceedings.)

 5          THE COURT:  If we could go back on the record.

 6          The Court finds that there's not a sufficient

 7   disclaimer to merit adding the word "automatically."  The

 8   Court is going to maintain its preliminary construction,

 9   and make it its final construction.

10          We are on next to the claim term that begins with

11   "resource management logic."

12          Mr. Bobrow, are you -- is this you, as well?

13          MR. BOBROW:  No, my -- my colleague, Mr. Daybell,

14   will be handling the -- the balance of the -- the terms,

15   which are all "means-plus-function."

16          THE COURT:  Well, I'm disappointed I won't have --

17   get to hear from you anymore, but I look forward to this,

18   as well.  So --

19          MR. BOBROW:  Thank you so much, Your Honor.

20          MR. DAYBELL:  Thank you, Your Honor.  Don Daybell

21   for Defendant.

22          So the first term is "resource management logic."

23          THE COURT:  Mr. Daybell, have -- I don't think you

24   appeared before in front of me, have you, to argue?

25          MR. DAYBELL:  I have not, Your Honor.  This is the

1  first time.

2       THE COURT:  Well, I wanted to welcome you to my

3  court.  It's a pleasure to have you.

4       MR. DAYBELL:  Thank you.  I'm pleased to be here.

5       So resource management logic -- and I'll -- I'll

6  spare you the lengthy recitation of the function.  I'd like

7  to cut straight to the chase on this one, and that is, it

8  is our view that this term is a means-plus-function term,

9  as Your Honor has preliminarily found, but that the

10  specification fails to disclose the complete structure

11  to -- that corresponds to the functions recited in the

12  claim.

13       In particular, as you can see on the slide I have

14  in front of you, the claim recites:  Resource management

15  logic to distribute server resources according to predicted

16  resource needs.

17       And when we look at the specification for any

18  teachings about how these resource needs are predicted such

19  that the server resources could be distributed, we find a

20  single sentence that is on the screen which says:  In the

21  exemplary embodiment, the resource requirement predictions

22  can be utilizing one of many algorithms.  And that's all

23  they say about how to predict the resources that you need

24  in order to -- the resource needs in order to distribute

25  the server resources.

 1          Clear Federal Circuit precedent holds that simply
 2    disclosing an algorithm or in this case one of many
 3    algorithms is insufficient to identify structure, and that
 4    renders the claim indefinite, and that's the Federal
 5    Circuit's seminal case in Aristocrat Technologies and the
 6    Triton Tech case from 2014.
 7          So it is our position that the resource management
 8    logic term is indefinite because it fail -- the
 9    specification fails to provide any algorithm for a function
10    that is required of the resource management logic, and that
11    function being to distribute server resources according to
12    predicted resource needs.
13          Now, the Court identifies Figure 3 as the
14    algorithm for the resource management logic, however, as I
15    just indicated, that algorithm fail -- and the supporting
16    text in the figure fails to disclose how resource
17    requirements are predicted.
18          In fact, it -- it essentially throws up its hands
19    and says, there's a lot of different ways you could do it
20    to a POSITA.  We're not telling you which one we've
21    invented.  We're not telling you which one to use.  We're
22    leaving that as an exercise to a POSITA to try and figure
23    out what the scope of this claim means.  And that's just
24    not proper under the -- the Federal Circuit's precedent on
25    indefiniteness.

1          The Federal Circuit's precedent on indefiniteness,

2    as applied to means-plus-function terms, says that you, the

3    patent owner, as a -- as the sort of quid pro quo for being

4    allowed to use functional claiming, have to provide the

5    algorithm, the structure, for the recited function.  And

6    they simply don't do that.

7          And that's really it with this one, Your Honor.

8    So with that, I will -- I will rest and wait to hear from

9    my esteemed colleague on the other side.

10         THE COURT:  Well, if every lawyer that appears in

11   front of me handles their claim term this quickly, then as

12   of right now, you're my favorite lawyer ever.  So --

13   especially for a means-plus-function claim.

14         So -- but you were -- I think you hit exactly the

15   most important issue, and I look forward to hearing from --

16   for a response from Plaintiff.

17         MR. DAYBELL:  Give me a moment to stop sharing my

18   screen so that -- there we go.

19         MR. FLYNN-O'BRIEN:  Thank you, Your Honor.  Can

20   you hear me okay?  This is Michael Flynn-O'Brien for the

21   Plaintiff again.

22         THE COURT:  I can, yes, sir.  Thank you,

23   Mr. Flynn.

24         MR. FLYNN-O'BRIEN:  All right.  Given the Court's

25   preliminary determination that 112(f) applies to this claim

1    limitation, we -- we agree that it's not indefinite and

2    dispute Microsoft's arguments to the -- to the contrary.

3           First, with respect to the claimed function, there

4    isn't a dispute.  The parties and the Court agree that that

5    function is to distribute server resources to each of the

6    plurality of virtual machines, according to current and

7    predicted resource needs of each of the multiple workloads

8    utilizing the server resources.  It's here reflected on the

9    slide in Claim 1.

10          Microsoft, however, in its briefs and in argument

11   today has chopped up and twisted this claim language in an

12   attempt to redefine the function so that it can find

13   indefiniteness where there is none.

14          In particular, and most egregiously, it drops the

15   portion to each of the plurality of virtual machines to

16   effectively rewrite this claim limitation so that the

17   function is a two-parter to distribute server resources

18   according -- according to current resource needs and

19   distribute resource -- server resources according to

20   predicted resource needs.

21          But that's not accurate.  The primary function

22   here and the one to which the claimed invention is directed

23   is this first part, to distribute server resources to each

24   of the plurality of virtual machines.

25          Yes, it recites according to current predicted

1   resource needs, but that as described in the background of

2   the invention are things known to some degree in the prior

3   art, specifically the background of the invention refers to

4   load balancers being known, and the ability to use load

5   balancers to measure current load being known, but it was

6   historically done on a per-server basis.

7          In addition, you know, there -- it discusses how

8   you -- you can use load balancers or other mechanisms to

9   predict resource needs, for example, the time of day, the

10  geography in which your customers are trying to access the

11  applications at issue.

12         What's unique and particular -- inventive about

13  this invention is how does it measure those current

14  predicted resource needs?  What does it use to measure

15  those?  Here, in the invention, the load balancers are

16  specific to customer applications or customers, and those

17  customer applications' workloads are distributed across

18  multiple machines.

19         What's further important is what the claimed

20  invention does with that information, and it distributes

21  those server resources to each of a plurality of virtual

22  machines in order to handle that distributed workload.

23         And that, we submit, is precisely the algorithm

24  that the Court has identified on Figure 3.

25         So here, we have Figure 3a, and we've highlighted

different stages of the algorithm.  First, on the left, you

have the measuring of the load.  Second, on the right, you

have a prediction being made.  It makes a prediction as to

the resource requirements of the customers.

Continuing on --

MS. GILBERT:  Excuse me, Mr. Flynn-O'Brien.  I

don't think we're seeing what you're seeing on -- you're

sharing on your screen.

MR. FLYNN-O'BRIEN:  Thank you, Counsel.  Could

you -- what exactly are you seeing?

MS. GILBERT:  I am seeing a PowerPoint

application, and it has -- we are on Slide 10 in the middle

with slides on the side.  Oh, and this is now showing us

the next slide.

MR. FLYNN-O'BRIEN:  Your Honor, I apologize for

this technical mishap.

MS. GILBERT: Yes, I think we are now seeing Slide

14.

MR. FLYNN-O'BRIEN:  Okay.

MS. GILBERT:  Thank you.

MR. FLYNN-O'BRIEN:  Just restate.

The algorithm that the Court has identified in

Figure 3, along with the corresponding description, matches

the claim language.  That algorithm is in Step 1 to measure

the load of the customer -- system customers; to 2, make

1  predictions as to the resource requirement was those system

2  customers; 3, to determine appropriate assignment resource

3  allocations for the VMs to accommodate the customer

4  application workloads; and, 4, as shown here on the right,

5  in Figure 3, to allocate and assign server resources and

6  workloads to VMs.

7        Microsoft's primary argument here is to -- is that

8  the algorithm needs to go further to require -- to actually

9  disclose kind of a subsidiary algorithm as to how that

10  allocation is -- how the measurement is done and how the

11  predictions are made.  But that is not necessary to the

12  claim limitation, nor is it the focus of the claim

13  limitation.  We submit that additional disclosure is not

14  required.

15        And with that, I'll -- I'll turn it over.

16        THE COURT:  If you-all would give me one second.

17  I'm going to give counsel for Microsoft an opportunity to

18  respond, but just give me one second.

19        (Pause in proceedings.)

20        THE COURT:  Okay.  A response?

21        MR. DAYBELL:  Yes, very briefly, Your Honor.

22        Counsel for Daedalus suggested that the

23  predictions and resource requirements are not required by

24  this claim, if I heard him correctly, and that's just not

25  true.

1        The claim clearly recites:  Distributing server

2   resources according to predicted resource needs.  That's

3   what we're focusing on.  It's true, it talks about where

4   it -- where the resources are or what -- what workloads are

5   required and things like that, but we're focusing on

6   distributing server resources according to predicted

7   resource needs.

8        And there simply is no algorithm for that

9   disclosed in the specification for predicting resource

10  needs.  And if I have no -- no way of predicting -- no way

11  of knowing how the resource needs are predicted, you can't

12  distribute the server resources according to those needs.

13  You have to be able to predict the resources in order to

14  distribute the server resources.

15       And I take it from Plaintiff counsel's silence

16  that they agree that there is no algorithm in the

17  specification for how to predict resource needs.  In fact,

18  the specification clearly says you could use one of many

19  algorithms.  You can pick an algorithm.

20       My final point, I guess, is the fact that a person

21  of ordinary skill in the art might be able to figure out

22  how to do it is not the test here.  The test is does the

23  specification disclose an algorithm to one of ordinary

24  skill in the art?

25       This specification, clearly -- in fact, I would

1   submit expressly says, no, I'm not telling you which

2   algorithm we're using.  I'm telling you there's a whole

3   bunch of them.  You go figure it out.  And with that, I'll

4   rest.

5            THE COURT:  I'll be back in just a few seconds.

6            (Pause in proceedings.)

7            THE COURT:  If we can go back on the record.

8            Again, the Court is going to maintain its

9   preliminary construction.

10           We'll turn to the next claim term, which I

11   understand begins with "global resource allocator."

12           Mr. Daybell, is this you, as well?

13           MR. DAYBELL:  It is me, as well, Your Honor.

14           THE COURT:  Did I get close to pronouncing your

15   name right?  Is it Daybell or Daybell?

16           MR. DAYBELL:  It's Daybell, just like the word

17   "day" followed by the word "bell."  Daybell.

18           THE COURT:  Got it.  Thank you, sir.

19           MR. DAYBELL:  Uh-huh.

20           Counsel, if you could stop sharing your screen,

21   please.  Thank you.

22           So "global resource allocator."

23           And, Your Honor, I'll try to be as brief as I was

24   on the last time -- apologies, let me just make sure I'm

25   not on mute.  I'm not.  Okay.

1          So the focus of the term here is the first three

2     words, "global resource allocator."

3          What we have here is a functional word, an

4     allocator, that allocates global resources.  And that's all

5     that the claim talks about that could be considered

6     structural.

7          So there is no structure to the term "allocator."

8     As this Court has -- has -- or as the Federal Circuit has

9     found, terms such as allocator there are simply functional

10    are means-plus-function terms because they don't teach any

11    particular structure.  For example, the Federal Circuit has

12    found that a symbol generator was simply describing the

13    function as generation of symbols.

14         Here, a global resource allocator is the same

15    thing.  It's simply something that allocates global

16    resources, and there's nothing else in the language of the

17    claim that suggests any structure.

18         Even if we were to assume that the allocator were

19    software, that is not sufficient structure, as this Court

20    has held in the context of the term "communication module,"

21    which we'll actually talk about a little bit later.

22         Here, this Court held that even though module

23    relates to software and communication module certainly

24    refers to software related to communication, that is

25    nowhere near the sufficiently definite structure required

1   by Federal Circuit precedent.

2          And the same thing applies here.  Even though an

3   allocator might be software and it allocates global

4   resources, that refers to maybe software that allocates

5   global resources, that's not definite structure.  It wasn't

6   in the Digital Retail case, and it's not here.

7          So because of that, we have to look to the

8   specification to see what algorithm is disclosed.  And we

9   submit it's the algorithm that we set forth in our papers,

10  which is similar to the one disclosed in Figure 3 of the

11  patent, although there is -- there is a difference because

12  this claim term does not specifically require predicted

13  resource needs; and, therefore, the more general algorithm

14  of Figure 3 is essentially the algorithm that -- that we

15  propose.  We had a few modifications to it.

16         But the key here is global resource allocator

17  simply is not -- there is -- simply is no structure in the

18  claim for what a global resource allocator is, which means

19  we have to go to the specification.  And once we do that,

20  it's a means-plus-function term.

21         I guess I would conclude with -- with noting that

22  if we were allowed to look at the specification for a claim

23  term under Williamson to decide whether it is

24  means-plus-function or not, then the only claim terms under

25  Williamson that would be means-plus-function would be those

1  that were indefinite because the specification had no

2  structure.

3        So we know that can't be the test.  The test here

4  has to be to look at the language of the claim and decide

5  if it discloses structure.

6        And this claim term simply does not.  It has a

7  global resource allocator for -- and that tells you where

8  it is, it's included in the workload servers, and for --

9  and then performing the function, receiving messages and

10  assigning a combination of -- there's simply nothing

11  structural in this claim.

12        And with that, I will rest.

13        THE COURT:  Response?

14        MR. FLYNN-O'BRIEN:  Thank you, Your Honor.

15        Your Honor, a couple preliminary points, and I'll

16  address Mr. Daybell's last point first, that the test in

17  Microsoft's view is that you must first -- in order to

18  determine whether 112(f) applies to a particular claim

19  limitation look at the claims in isolation of the spec.

20  That is not true.

21        In Egenera, a case repeatedly cited by Microsoft

22  in its briefs, the Court said to determine whether a claim

23  limitation at issue con -- connotes sufficiently definite

24  structure to a person of ordinary skill in the art, we look

25  first to the intrinsic evidence.  That is not limited to

1  the claims.  It includes the specification and the file

2  history.

3          This Court has held in accord in Ancora Techs

4  earlier last year where it said -- it said:  The

5  presumption stands or falls according to whether one of

6  ordinary skill in the art would understand the claim with

7  the functional language in the context of the entire

8  specification to denote sufficiently definite structure or

9  acts for performing the function.

10          So the Court can and should look to the entire

11 intrinsic record consistent with Phillips in order to

12 determine whether in the first instance 112(f) applies.

13          With respect to the claim limitation at issue

14 here, global resource allocator, first of all, I'd address

15 the notion that there is no structure in the claim.  That

16 is also false.  What's missing from the recitation of the

17 limitation at issue in -- at the top in the joint claim

18 construction brief is this notion for inclusion of said

19 provider of workload servers.

20          It recites a global resource allocator, GRA, for

21 inclusion of said provider workload servers.  In addition

22 to that structure -- so that's saying -- we're talking

23 about a piece of software and a particular piece of

24 hardware.

25          In addition, the claim language itself talks about

1    the inputs and outputs to that structure, and that the

2    relationship between that structure, the global resource

3    allocator, and other structures in the claims, including

4    the virtual workload servers, the customer workloads, the

5    load balancer, and all of that is within -- encompassed

6    within a server optimization device having a processor.

7            So it is not true that there is no structure in

8    the claim with respect to global resource allocator.

9            Second of all, the specification is very clear.

10   In Figures 1, for example, shown here on the screen, the

11   specification discloses and describes the global resource

12   allocator.  That is in the box on the top left of this

13   figure labeled GRA.  The specification describes how the

14   GRA -- what it is and how it operates and how it interacts

15   with other structures in the claim system.

16           Furthermore, the specification goes into great

17   detail in Figures 2 and 3, in combination with Figure 1 and

18   the corresponding text as to how the GRA interacts with

19   other structural elements in the claimed invention.  That

20   interrelationship itself also provides definite -- definite

21   structure, as our expert, Dr. Madisetti, described a person

22   of ordinary skill in the art viewing the claims in light of

23   the specification would understand the GRA to be

24   structured.

25           Thank you.

1          THE COURT:  Any rebuttal?

2          MR. DAYBELL:  Yes, Your Honor.

3          If I could have the presentation back.

4          So the Federal Circuit has clearly set forth what

5     the test is for determining whether means-plus-function

6     claiming applies.

7          This is from the Advanced Ground Information

8     Systems case.  And the Federal Circuit held:  First, we

9     addressed whether the term in the asserted claim is

10    means-plus-function.  And they say that the -- in that case

11    that the standard is whether the words of the claim are

12    understood by persons of ordinary skill in the art to have

13    sufficiently definite meaning as the name for structure.

14         A global resource allocator fails this test.

15    There is no evidence in the record that a person of

16    ordinary skill in the art would have understood an

17    allocator as the name for structure.

18         Their expert does not identify any treatises or

19    textbooks or other -- other sources of information that a

20    POSITA would have looked at that would have said this is

21    what a global resource allocator is.  It's a known term in

22    the art.  It does these various functions.

23         Instead, counsel points to structure for other

24    components of the claim.  Counsel points to the fact that

25    the claim recites a load balancer, for example.  Well, a

1  load balancer is a -- a component that does have a fairly

2  well-understood structure, which is why we didn't propose

3  it as a means-plus-function term.  But it is not a global

4  resource allocator.  It is a load balancer.

5       Counsel points to other components that the load

6  balancer is connected to, but that doesn't tell you what

7  the load balancer -- sorry, what the global resource

8  allocator is connected to.  That doesn't tell you what the

9  global resource allocator is, what its structure is.

10      To get that, you have to look at the algorithms

11 set forth in the specification.  But once you go there, you

12 are past the -- the first part of the test as to whether

13 this is a means-plus-function term, and you are into the

14 second part of the test, which is having decided that the

15 global resource allocator is means-plus-function, you look

16 to figure out what the corresponding structure in the

17 specification is.

18      And we would submit that that structure is the

19 algorithm that we have set forth and that the term should

20 be construed as means-plus-function.  In order to give any

21 meaning to the Williamson case -- line of cases, which say

22 that you can have means-plus-function terms that don't use

23 the word "means."

24      In fact, this Court's pronouncement in the case I

25 spoke about earlier about communications module is on point

1  there, as well.

2          In that one, the Court found that the

3  communications module was a means-plus-function term and

4  then looked to the specification to find the algorithm for

5  it.

6          Thank you.

7          THE COURT:  Anything else from Plaintiff?

8          MR. FLYNN-O'BRIEN:  Briefly, Your Honor.

9          First, with respect to Advanced Ground Information

10 System, which Microsoft is relying upon here, the two-step

11 inquiry described in that case is the overall 112(f)

12 inquiry, right?

13         Step 1, determine whether 112(f) applies.  To do

14 that, you look at the entire specific -- the entire

15 intrinsic record.  Step 2, then -- if it does apply, then

16 you define the scope of the term with reference to the

17 specification.

18         I submit that Microsoft's misreading that case.

19         Regardless, that from 2016 is, of course,

20 superseded by Egenera, which otherwise Microsoft relies

21 upon, which refers to in that first step, where you're

22 determining whether 112(6) applies, you look at the entire

23 intrinsic record.

24         Microsoft also points out -- or purports to claim

25 that Daedalus has not identified any evidence of a person

of ordinary skill in the art would understand the GRA in

the claims to refer to structure, and that is incorrect.

Of course, Dr. Madisetti, in his declaration, this is

Docket 29-1, Paragraphs 49 through 52, establishes that a

person of ordinary skill in the art, in viewing the term --

limitation in question, would understand the GRA to refer

to a structure.

            With that, I will rest.

            THE COURT:  Anything else from Plaintiff?

            MR. DAYBELL:  Briefly.  Very briefly, Your Honor.

Simply to observe that --

            THE COURT:  On the record, I screwed up.  Anything

else from Microsoft?  I apologize.

            MR. DAYBELL:  Very briefly.  Very briefly, Your

Honor.  Simply to observe that Dr. Madisetti didn't

identify any support for his opinion that the global

resource allocator would be structural in the terms of

treatises or textbooks or examples of other persons of

skill in the art using that term in any sort of technical

sense.

            That's it.

            THE COURT:  Anything else for Plaintiff?

            MR. FLYNN-O'BRIEN:  No, Your Honor.  Thank you

very much.

            THE COURT:  I'll be back in a few seconds.

1              (Pause in proceedings.)

2              THE COURT:  If we can go back on the record.

3              The Court is going to maintain its preliminary

4    construction.

5              And we'll turn to the final claim term that I'm

6    aware of, which is "communication module."  And, again, we

7    will -- I'll start with -- with the Defendant, Mr. Daybell.

8              MR. DAYBELL:  Thank you, Your Honor.

9              Let me get my screen share going.

10             So the term "communication module," this is from

11   the '132 patent.  And the -- the Court has -- we've already

12   talked about the case.  The Court has already held that a

13   communication module in another case is means-plus-function

14   because modules are not words that do not impart structure.

15             In this particular patent, it is abundantly clear

16   that a module can be practically anything.  The patent

17   specification, at Column 4, recites that the functional

18   units described in the specification has been labeled as

19   modules, in order to more particularly emphasize their

20   implementation independent.

21             So we have a patent that expressly tells a POSITA

22   these modules are functional, and they can be implemented

23   any way you want.  They're implementation independent.

24   Then it gives some examples about hardware, circuits,

25   programmable hardware, or software.

1          So this is a module -- this is a term that can be

2    anything.  And as we know, a communication module, as the

3    Court has previously held, simply refers to a module used

4    in communication.  That's not sufficiently definite

5    structure as required by Federal Circuit precedent.

6    Therefore, this communication module term should be

7    construed to be means-plus-function.

8          Once we get there, the remainder of the term, if

9    we were to look at the rest of the claim language, as we

10   are supposed to do under the Advanced Ground Systems case,

11   simply says that the module is operable to perform certain

12   functions and is configured to perform certain functions.

13         Here, again, the Federal Circuit has spoken and

14   has clarified that operable when executed refers to a

15   desired function or outcome, without providing any

16   limitations or detail -- any limiting detail.

17         And the Southern District of New York has agreed

18   and says that monitoring device invokes MPF claiming

19   because it simply recites function -- or recites a device

20   operable to perform functions.  So "operable to" does not

21   convey any structure to an otherwise functional term.

22         And similarly, "configured to" does not either.

23   The Federal Circuit, again, has spoken.  Using -- replacing

24   the word "for" with the word "configured to" is purely

25   functional claim language identifying what the user

1  identification module in that case was configured to do,

2  and that provides no structure.

3       And similarly, reciting what the mechanical

4  control assembly in the MTD Products case was configured to

5  do is, again, functional, it's not structural.  So there is

6  no structure recited in this -- in this claim limitation,

7  which means that we need to look to the specification to

8  find the algorithm, as this Court well knows.

9       However, there is no algorithm set forth for the

10  communication's function in -- in this patent.  The patent,

11  a couple of places, recites that the client communicates

12  with the server, but it doesn't say anything about how.  It

13  doesn't provide a series of steps about what the client

14  needs to do in order to communicate with the server.  It

15  simply says the client can communicate.

16       In a few places, it talks about other functions,

17  like translating, that happen either before or after a

18  communication, but it doesn't talk about the communication

19  function itself.

20       And, in fact, Plaintiff was unable to identify any

21  algorithm in the specification for the communication

22  function either.  It simply asserts that a number of

23  hardware elements are involved, a processor, a network, a

24  network interface, and that there was an algorithm

25  disclosed somewhere within four figures of the patent, the

1  text that corresponds to it, and the laundry list of

2  citations that spans across a number of columns of the

3  specification.

4          That's not an algorithm.  That's -- that's an

5  attempt to find whatever they could and throw it at the --

6  at the wall and hope something sticks.

7          To the extent that Daedalus contends that a

8  processor provides a structure, we know from WMS Gaming

9  that a processor can't provide structure for a

10  computer-implemented claim.  It needs to be a processor

11  configured with a particular algorithm.

12          And to the extent that Daedalus contends that

13  networks are structure, this is also incorrect.  The

14  networks, according to the specification, provides

15  connections between the various components, so the clients

16  are connected physically with -- with the network, and the

17  servers are connected physically with the network.  But

18  that doesn't say anything about how the data is transmitted

19  back and forth across these connections.  So that's a

20  different function.

21          And the network interface that Daedalus points to

22  simply isn't part of the communication module.  If we look

23  at Claim 9, it recites the communication module.  And then

24  there's a dependent claim, Claim 11, which says that Claim

25  9 further comprising a network interface.  So the network

1  interface is an additional component separate from the

2  communication module, so it can't provide the structure for

3  the communication module itself.

4          And with that, I will rest my point, unless the

5  Court has any questions.

6          THE COURT:  A response?

7          MR. FLYNN-O'BRIEN:  Yes, Your Honor.

8          Let me get our slides up.

9          MR. DAYBELL:  Yeah, let me get out of the way.

10 There.

11         MR. FLYNN-O'BRIEN:  First of all, there is no such

12 thing as a per se nonce word.  Daedalus's briefs are

13 replete with cases, from this Court and others, declining

14 to apply 112(f) to terms containing the words "logic" or

15 "module" and the like.

16         The fact that a claim term or claim limitation --

17 extensive claim limitation, as in this case, uses the word

18 "module" or does not itself render it subject to 112(f),

19 what matters, of course, is whether a person of ordinary

20 skill in the art, in view of the claim language and the

21 specification, understands the claim limitation as issued

22 to refer to structure.

23         And here, it clearly does.

24         Now, Microsoft wants to discount the presence of

25 modifiers, such as communication, on communication module.

1    But -- but that is -- is distinction with a difference.

2          On the one hand, you have cases like Egenera and

3    Digital Retail on which Microsoft relies where it recites a

4    module or logic with no modifiers.

5          And on the other hand, you have cases like those

6    cited in Plaintiff Daedalus's briefs, Mynette, CDN,

7    Intellectual Ventures, where the word "module" was preceded

8    by modifiers that in view of a person of ordinary skill in

9    the art gave the term sufficient structure, and that's

10   certainly the case here.

11         Courts have, both before and after Williamson,

12   declined to apply 112(f) to communication module.

13         On this slide, we're citing to Intellectual

14   Ventures II v. FedEX, from the Eastern District of Texas

15   2017.  And we have below that Blast Motion v. Zepp from the

16   Southern District of California, also in 2017.

17         In both cases, the Courts were looking at

18   "communication module" and declining to apply 112(f), just

19   as this Court has done in its preliminary constructions.

20         In the Intellectual Ventures case, the Court

21   determined no construction was necessary, much like this

22   Court has done.

23         And in Blast Motion, of course, the Court

24   construed the term to mean hardware and/or software capable

25   of transmitting data between devices.

1         In neither cases was the term, of course, held to

2    be indefinite.  The distinction, of course, what matters is

3    the claim language.  And, here, the claim language clearly

4    denotes structure to a person of ordinary skill in the art.

5         You have a data management system comprised of

6    various structures.  A policy set, a file evaluation

7    module, a file usage module.  I point out that Microsoft

8    does not contend that either of these other module terms

9    are subject to 112.  And a communication module.

10        And what's particularly important here is to note,

11   this claim limitation specifically recites where that

12   communication module is and what it does.  It is between

13   the file evaluation module and a plurality of remote

14   clients.

15        And I will direct you, of course, to Claim 9,

16   which Microsoft focused on in its presentation, shown here

17   in the center of this slide.

18        Here, in Claim 9, it goes further.  It refers to a

19   communication module that is within a metadata server, that

20   metadata server comprising a processor and a memory.

21   Within that memory, computer code.  And within that

22   computer code, a communication module.  Thus, we have

23   specific and sufficient structure, a software structure on

24   a particular piece of hardware designed to perform a

25   particular function, as described.  That is sufficient

1  structure to avoid the advent of 112(f).

2          And it may be worthwhile, with respect to -- so

3  the claim refers to structure.  There is no need to further

4  look for an alleged algorithm.

5          Microsoft focuses -- even if you were to look for

6  an algorithm or something of that sort, Microsoft focuses

7  on the lack of -- or what it purports to think of as a lack

8  of disclosure of a particular protocol that the

9  communication module uses.

10          But as shown in our -- in the declaration of Vijay

11  Madisetti, in the context of this invention and this claim,

12  a person of ordinary skill in the art is going to

13  understand that there is a class of communication protocols

14  that make sense.

15          Here, we have a data management system distributed

16  with clients, as shown in this figure in multi-colors in

17  the top left, of heterogeneous operating systems,

18  communicating via a LAN, that's the line on the left

19  labeled 112, to metadata servers in purple below.

20          A person of ordinary skill in the art is going to

21  understand the communication protocols likely used by those

22  devices are going to be something like TC/IP (sic), which

23  Microsoft itself relies upon in this case.

24          Furthermore, you have the -- these workstations or

25  servers, these clients and metadata servers connected to

1  storage ports via a SAN.  A person of ordinary skill in the

2  art is going to understand certain class of communication

3  protocols is going to be used by that structure, SAN,

4  including fiber channel, InfiniBand, and the like.  So

5  there is no real lack of disclosure, even if one was

6  required, which none is.

7        Finally, I just point out that Microsoft kind of

8  gives the back of the hand to this notion of how the

9  communication module -- what the specification describes

10  the communication module is doing in order to facilitate

11  communications between the file evaluation module and the

12  plurality of remote clients using different operating

13  systems as claimed.

14        The specification explains that that communication

15  module will in -- there's a problem caused by these clients

16  of -- with different operating systems, namely that their

17  file attributes of those files cannot be easily compared.

18  The specification explains the communication module

19  sometimes includes the translation module.

20        So in cases where the file attributes are sent in

21  the universal format, it accepts them as is and sends them

22  on the file evaluation module.  But in other cases where

23  it's in a platform-specific format, the communication

24  module then has a translation -- performs translation to

25  translate those platform-specific attributes into a

1   universal format for use with the rest of the system.

2       All of which to say that communication module, as

3   claimed, is structure, and there is no reason to apply

4   112(f) to this term.

5       Thank you.

6       THE COURT:  A response?

7       MR. DAYBELL:  Yes, Your Honor.

8       So, first, I guess I'll take one of the last

9   points Mr. Flynn-O'Brien made.  He contended that the

10  specification discloses that a communication module can

11  include a translation module.  That -- that's simply

12  incorrect.

13      The specification says nothing about what the

14  communication module does.  It doesn't even use the words

15  "communication module" outside the claims.  So it's simply

16  incorrect that this communications module allegedly

17  includes a translation module.

18      Secondly, Mr. Flynn-O'Brien suggested that there

19  are certain functions that, as he put it, facilitate

20  communications.  Well, facilitating communications is not

21  communicating.  That may be a step that happens before or

22  after a communication, but it is not a communication.

23      And, third, I still haven't heard of any algorithm

24  that is disclosed in the specification, nor have I heard

25  Mr. Flynn-O'Brien identify any such algorithm.  He threw

out a few buzz words about TCP/IP and fiber channel and
what a person of skill in the art might understand, but
none of that is set forth in the specification.

And as our expert, Dr. Zadok, has explained, at
Paragraph 67 to 70, the problem -- of his declaration --
the problem of solving multi-client, multi-server
communications, as claimed in this claim, is a complex
problem.  It's not simple.  It's not straightforward.
There are many different ways to do it.

And it was incumbent upon the patent owner to
identify the particular algorithm that they intended to be
used for this communications module in order to benefit
from the functional claiming that they resorted to, and
they simply did not.

Now, if we turn to the -- their -- their argument
about other structure recited in the language of these
claims, that's -- with all due respect, that is not
anything having to do with the communications module.  The
processor is simply a processor.

As we all know, processors by themselves do not
provide structure for software and things.  The module is,
as Claim 9 recites, a piece of code, and, therefore, you
have to provide an algorithm for that code.  Simply saying
that it's software is insufficient.

If Mr. Flynn-O'Brien would give me the screen

1    back.

2              The case cite from this very Court could not be

3    more on point.  The term "communication module" simply

4    refers to a module that is used in communication -- it's

5    what this Court held in a previous case in Digital Retail

6    Apps.

7              So, first, I would note that contrary to

8    Mr. Flynn-O'Brien's statement, this Court was addressing

9    exactly the term at issue here, a communication module.  It

10   was not addressing a module in a vacuum.

11             And this Court held that even though that

12   pertained to software, that module did, and even pertained

13   to software referring to -- relating to communication,

14   there still was nowhere near sufficiently definite

15   structure required by Federal Circuit precedent.

16             And exactly the same thing applies in this case.

17   The claim does not recite any structure.  It simply recites

18   the communication module that is operable and configured to

19   perform various functions.  It does not -- the claim does

20   not say that the communication module is located between a

21   file evaluation module and the client.  It says that it is

22   operable to communicate between the two.  It says nothing

23   about where this module is located with respect to these

24   two other -- other components.

25             There -- there simply is no -- to paraphrase the

 1  client's previous one about "Where's is the beef," there is

 2  no "there" there.  There is no algorithm there.  And for

 3  that reason, we submit that this claim is indefinite.

 4          THE COURT:  Any response?

 5          MR. FLYNN-O'BRIEN:  Yes, sir, briefly.

 6          Mr. Daybell, would you mind giving back control?

 7          MR. DAYBELL:  There we go.

 8          MR. FLYNN-O'BRIEN:  There is no algorithm

 9  necessary here because the term "communication module,"

10  particularly the entire limitation at issue, connotes --

11  denotes sufficient definite structure for a person of

12  ordinary skill in the art.

13          In that regard, I would direct the Court to

14  Dr. Madisetti's declaration, which is Docket No. 29-1,

15  starting at Paragraph 71 and continuing through 78.

16          Digital Retail, on which Microsoft relies is

17  distinguishable.  In that case, the claim recited

18  communication module on an island.  It was a limitation on

19  its own.

20          It was not as it is in this case, related to other

21  claim limitations or had additional disclosure of what that

22  communication module did, how it interacted, where it sat

23  in relation to other claimed elements, and how it

24  interacted with those claim elements to achieve a

25  claim-recited objective.

1          In that regard, this case -- well, I would also

2  mention that in Digital Retail Apps, the claim at issue

3  specifically recites steps for.  It had the words "steps

4  for."  So it didn't have the presumption, as you would have

5  in this case, that 112(f) does not apply.

6          This case is more like the -- this Court's prior

7  decision in Ancora Tech, where it found a particular piece

8  of software on a particular piece of hardware designed for

9  a particular purpose to connote sufficient structure to a

10  person of ordinary skill in the art, such that it avoided

11  the ambit of 112(f) and maintained the presumption.

12          And with that, I will pass.

13          THE COURT:  Okey-dokey.  Anything else from

14  Microsoft?

15          MR. DAYBELL:  No, Your Honor.

16          THE COURT:  Okay.  I'll be back in a few seconds.

17          (Pause in proceedings.)

18          THE COURT:  Let's go back on the record.

19          The Court is going to maintain its preliminary

20  construction and make it its final order.

21          Let me ask you this, Mr. Flynn, just because

22  you're in my picture, a particular spot, do you know

23  whether or not we have given you-all a trial date?

24          MS. DE MORY:  I believe, yes.

25          MR. FLYNN-O'BRIEN:  Yes, Your Honor, you have.

 1          THE COURT:  And can you tell me when -- what month

 2    that is?

 3          MR. FLYNN-O'BRIEN:  Again, if you give me a

 4    second.

 5          THE COURT:  Or anyone can jump in.  I --

 6          MS. GILBERT:  Your Honor, it is November 14th,

 7    2022.

 8          THE COURT:  Okay.  Give me just a second and let

 9    me make sure that that -- that that is actually a good

10    date, but it sounds to me like it probably will work.  Just

11    give me a second to verify that, and I'll be right back.

12          MR. FLYNN-O'BRIEN:  Thank you.

13          (Pause in proceedings.)

14          THE COURT:  Okay.  Gentlemen and ladies, that date

15    works for us.

16          I'll start with the Plaintiff, is there anything

17    else that we need to take up?

18          MR. FLYNN-O'BRIEN:  No, Your Honor.  Thank you.

19          THE COURT:  And for Defendants?

20          MR. BOBROW:  No, Your Honor.  This is Jared

21    Bobrow.  I think that is it.

22          THE COURT:  It was a pleasure to have all of you.

23    It's an amazing level of talent I see in -- day in and day

24    out arguing these.

25          The work that you-all did -- I know my technical

1  advisor told me the briefs were really, really good in this

2  case, and they were very helpful.

3          And as usual, what's amazing is how you-all did

4  essentially average performances for the lawyers I have,

5  which means they were all terrific.  So I appreciate the

6  great lawyering that we had today.

7          Take care.  And I look forward to seeing some of

8  you, I hope, in the not-too-distant future here in Waco.

9          Take care.

10          (Hearing concluded 3:50 p.m.)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                            CERTIFICATION

2

3          I HEREBY CERTIFY that the foregoing is a true and

4    correct transcript from the stenographic notes of the

5    proceedings in the above-entitled matter to the best of my

6    ability.

7

8

9     /S/ Shelly Holmes                    11/8/2021
     SHELLY HOLMES, CSR, TCRR             Date
10   CERTIFIED SHORTHAND REPORTER
     State of Texas No.: 7804
11   Expiration Date: 10/31/2023

12

13

14

15

16

17

18

19

20

21

22

23

24

25